

SO ORDERED,

**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BILLY CRAY JONES | ) | Case No.:  15-14513-JDW |
| and JUDY CAROLYN JONES, | ) | |
| Debtors. | ) | Chapter:  13 |

| | | |
|---|---|---|
| MID-SOUTH MAINTENANCE, | ) | |
| INC., *et al.*, | ) | |
| Plaintiffs. | ) | |
| v. | ) | A.P. No.:  16-01062-JDW |
| | ) | |
| BILLY CRAY JONES | ) | |
| and JUDY CAROLYN JONES, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

This adversary proceeding is before the Court on the *Adversary Complaint* (the "Complaint") (A.P. Dkt. #1) to determine dischargeability filed

---

[1] This Memorandum Opinion and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

by the creditor-plaintiffs Mid-South Maintenance, Inc.; Mid-South Maintenance, Inc., Memphis; and Worldwide Steel Works, Inc., (collectively, "Mid-South") against the debtor-defendants Billy Cray Jones and Judy Carolyn Jones (the "Defendants").

This trial encompassed three related adversary proceedings[2] centered around the undisputed embezzlement of Mid-South's funds by non-defendant Kimberly Cray Burk, the daughter of these Defendants. Her scheme involved falsifying the employment of her parents, and others, as employees of Mid-South and depositing paychecks into their bank accounts, which she controlled. The three adversary proceedings share common issues of fact and law. Many of the witnesses testified to facts material in all three proceedings, and the arguments were virtually identical. For these reasons, the adversary proceedings were tried together, although each remains distinct.

The defendants in each adversary proceeding told basically the same story: although tens of thousands of embezzled dollars went through their accounts, none of the defendants had any knowledge that they were spending embezzled funds because Kimberly controlled the bank accounts and they never looked at their bank statements. All of the defendants claim that Kimberly perpetrated this embezzlement without their knowledge, even

---

[2] *Mid-South Maintenance, Inc. v. Burk*, A.P. 16-01063 and *Mid-South Maintenance, Inc. v. Smith*, A.P. 16-01064.

though the defendants, not Kimberly, spent the majority of the money, which greatly exceeded their own personal incomes. In determining the facts that follow, the Court's in-person observation of each witness was an important factor in determining credibility.

Having heard extensive testimony over a period of three days and examining the documents admitted into evidence, this Court concludes that a judgment of nondischargeability is due to be entered in favor of Mid-South against debtor-defendants Billy Cray Jones and Judy Carolyn Jones.

## I.   <u>JURISDICTION</u>

This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334, and the *United States District Court for the Northern District of Mississippi's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 6, 1984. This is a core proceeding as set forth in 28 U.S.C. § 157(b)(2)(B) and (I).

## II.   <u>FINDINGS OF FACT</u>[3]

### A. <u>Common Facts</u>

Kimberly Burk, who is not a defendant here, is a persistent criminal. She is currently serving her third prison term for embezzlement. In 1990, she

---

[3] To the extent any of the findings of fact are considered conclusions of law, they are adopted as such. To the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

pleaded guilty to bank fraud after stealing approximately $50,000 from an employer. In 2011, she pleaded guilty to embezzling $40,000 from another employer, Nu-Corp. She has most recently pleaded guilty to embezzling at least $1.4 million from Mid-South, and is currently in prison for that crime. This third embezzlement forms the foundation of this adversary proceeding.

Kimberly began working for Mid-South in 2005, eventually becoming the office manager. Through this position, she deposited unearned payroll checks into various accounts of family members by direct deposit. In order to hide her scheme, Kimberly received all of the bank statements for Mid-South. She then gave falsified summaries to Mid-South's owner, CPA, and auditors. When other employees raised questions, Kimberly would fire them. Mid-South's annual audit and outside CPA firm did not uncover Kimberly's scheme. In fact, the Mid-South embezzlement was discovered only after Kimberly went to prison for embezzling from Nu-Corp.

During the relevant time period, Mid-South's annual income averaged $15,000,000. The $300,000 a year that Kimberly stole was material, but not so crippling to the company that theft was suspected. Dennis Jones, owner of Mid-South, assumed the company's construction projects were not doing well and that was the reason for the decreased profits. This assumption was supported by the project summaries Kimberly gave him. Dennis credibly

testified that he was so focused on the construction side of his business that he never considered that the issue was coming from the office.

Late in her term with Mid-South, Kimberly was arrested for embezzling $40,000 from Nu-Corp. Despite the charges, Dennis allowed Kimberly to continue working at Mid-South in the same capacity, because Kimberly convinced him of her innocence. She told him that the charges were related to stock certificates and expense checks cashed by others. The defendants argued that this arrest should have put Dennis on notice of Kimberly's activities, but Dennis credibly testified that he believed Kimberly. All witnesses (plaintiff and defense) testified that Kimberly was very convincing and deceived everyone. All witnesses also testified that Kimberly worked hard and was competent in her job.

Allusions were made by the defendants to a romantic relationship between Kimberly and Dennis, but there was no evidence to support this. All witnesses in close proximity credibly denied any improper relationship, including Kimberly and Dennis.

### B. Billy and Judy Jones

Billy Jones is Kimberly's father and an experienced businessman. He worked in the retail grocery business for approximately 50 years, first as an employee and later as a consultant. He was the Vice President of Piggly Wiggly, where he prepared budgets and managed profitability in order to earn

a bonus.  He testified that he was "absolutely" familiar with profit and loss statements and was responsible for moving thousands of dollars.  Despite his business background, Billy testified that he did not know anything about his personal bank account and never did any accounting for his business, JBK.  He testified that he never checked bank statements or accessed his account online and rarely wrote checks.  He testified that he depended solely on his wife, Judy, to manage their financial affairs.  Billy never worked for Mid-South, but received, and spent, $188,764.66 in payroll checks.

Judy Jones is Billy's wife and Kimberly's mother.  She has extensive experience in business management and accounting software sales and training.  She also worked briefly as the President of Nu-Corp, Kimberly's employer prior to Mid-South and second embezzlement victim.  Judy was the President of Nu-Corp when the charges were brought against Kimberly for the Nu-Corp embezzlement.  In fact, Judy pleaded guilty to a misdemeanor associated with Kimberly's theft.  Judy paid at least $50,000 to an attorney to defend herself, so she and Billy were well aware of Kimberly's history of stealing from employers.

Despite being acutely aware of Kimberly's past, Judy allowed Kimberly access to the Defendants' personal accounts and testified that neither defendant checked bank records.  Judy also allowed Kimberly to receive all of the Defendants' bank statements.  Judy has extensive experience with

accounting, and testified that she knows the importance of bank statements in balancing accounts. Judy ignored all of her financial training, and training she gave others, and allowed Kimberly, a known embezzler, to receive all of her bank statements and to have control over her accounts.

Even though Judy was responsible for the Defendants' personal finances, Judy claimed that she did not do any accounting for their personal account. She testified that she never looked at bank statements, accessed accounts online, or checked deposits or withdrawals. She testified that she relied solely on her check register by recording deposits received and checks written.[4] Judy claimed that she always knew where their money was going and the amount that they had in their account, but was unable to identify any expenses when shown bank statements at trial. She was also unable to show that she ever did any reconciliation between her bank statements and her check register.

JBK is an unincorporated business, created by the Defendants, that sells accounting software. It sells, installs, and trains customers to use the software to monitor their holistic financial picture and prevent employee theft. At all times, Billy was the president of JBK and Judy performed all of the operations of the business, including ostensive management of its financials. While JBK only made $20,000 to $30,000 a year, the Defendants claimed to be completely

---

[4] Despite the extensive testimony of Judy's reliance on her check register, it was never offered into evidence.

ignorant of the $302,215.42 received from Mid-South that flowed through JBK's account, even though JBK had no relationship with Mid-South.

Despite being the president, Billy testified that he knew nothing about JBK's bank account. Billy testified that while in the grocery business, he utilized internal controls to prevent employee theft. Yet, he did nothing in his own business to manage his affairs. He testified that he never looked at bank statements, accessed the account online, inquired about the account at the bank, or made withdrawals. He claimed to depend solely on his wife, Judy, to not only manage their personal finances but also those of JBK.

Even though Judy was the bookkeeper for JBK, she testified that she never received any of the bank statements or the financial documents that would have shown the deposits from Mid-South, because she had given Kimberly control of the JBK account with no supervision. She testified that the only accounting she did for JBK was transfer information into QuickBooks (not the software JBK sold) from the check register, and she only looked at it a few times a year. She knew that bank statements were important, but claims that she allowed Kimberly to receive all the statements. Judy trained people to use accounting software, but did not use her own product or training in her business.

Judy testified that she knows interest generally accrues on bank accounts, must be reported on taxes, and is recorded on bank statements. She

testified that she teaches this to her customers.  Despite this, Judy testified that she never checked her bank statements for the amount of interest and did not report any interest that accrued on any of the accounts.

Judy claims that she and her husband did not spend all of the money deposited into their accounts.  Judy testified that Kimberly stole a checkbook from her and wrote checks.  However, Judy never noticed the huge gaps in check numbers between the checks Judy wrote and those written by Kimberly, despite Judy's complete reliance on her checkbook and register.  At trial, she was unable to identify checks written by Kimberly.  There were multiple checks purportedly signed by Billy and/or Judy which they claimed to not have written.  However, the signatures on those checks appear to be the same as checks Judy endorsed to herself and those on a notarized deed of trust admittedly signed by the Defendants.  The Court did not find the Defendants' testimony credible that the checks were not signed by them.

In the aggregate, $490,980.08 of embezzled funds flowed through the JBK account or the personal accounts of the Defendants.[5]  The Defendants presented no evidence that they did not spend this money.  The Court does not find the Defendants' testimony that that they had no knowledge of the scheme credible.[6]

---

[5] Judy worked for Mid-South for a very brief period of time.  These totals are net of the amounts legitimately earned by Judy during this brief period.

## III.   <u>CONCLUSIONS OF LAW</u>

Section 523 of Title 11 of the United States Code[7] outlines the exceptions to discharge in bankruptcy proceedings.   The creditor bears the burden of proof of establishing by a preponderance of the evidence that the debt in question should be excepted from discharge.   *Grogan v. Garner*, 498 U.S. 279, 286 (1991).   Exceptions to discharge are to be narrowly construed in favor of the debtor in order to effectuate the fresh start policy of the Bankruptcy Code. *Miller v. Abrams (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998).

There is no dispute that the Defendants received the funds at issue or that the funds belonged to Mid-South.   No one disputes that the Defendants should not have received these funds.   None of the money has been repaid to Mid-South.   The debt detailed above is owed, and the only question is whether it is nondischargeable.

---

[6] In addition to the Court's observation of Judy Jones's live testimony, her violation of the sequestration order was considered in determining her credibility.   For witnesses not common to the defense of each defendant, the Court invoked Federal Rule of Evidence 615 at the beginning of the trial.   Judy was present during argument on this issue and was aware that she was not to discuss any of the testimony that was made or observed with any other witnesses.   During a recess, Judy discussed her testimony with witness Jessica Smith, which Jessica admitted under oath.   After receiving a warning, Judy again violated the sequestration order and discussed the trial with Kimberly, over the phone prior to Kimberly's testimony.   The U.S. Supreme Court has long recognized that a trial court may employ one of three remedies when a sequestration order has been violated: sanction of the witness; instructions to the jury that they may consider the violation toward the issue of credibility; or exclusion of the witness's testimony.   *U.S. v. Cropp*, 127 F.3d 354, 363 (4th Cir. 1997) (citing *Holder v. United States*, 150 U.S. 91 (1893)).   As the fact finder in this case, the Court considered these violations in determining Judy's credibility.

[7] All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.

Mid-South asserts that the debt is nondischargeable under §§ 523(a)(2)(A) and (a)(4). The court concludes that Mid-South has carried its burden against the Defendants under § 523(a)(2)(A).

## A. <u>Dischargeability under 11 U.S.C. § 523(a)(2)(A)</u>

The relevant portion of 11 U.S.C § 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> . . .
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). The United States Supreme Court has distinguished between "false pretenses and representations" and "actual fraud," and recognized two distinct paths for nondischargeability under 523(a)(2)(A). *Husky Intern. Electronics, Inc. v. Ritz*, --- U.S. ---; 136 S. Ct. 1581, 1586 (2016). Satisfaction of the elements of either path is sufficient.

### 1. <u>False Pretenses and Representations</u>

In order for a debt to be nondischargeable based on false pretenses and false representations, the objecting creditor must prove by a preponderance of the evidence that the debtor's representation was: (1) a knowing and fraudulent falsehood[8] (2) describing past or current facts (3) that was relied on

---

[8] The United States Supreme Court recognized the distinction between false representations and pretenses from actual fraud under §523(a)(2)(A). *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016) ("Congress did not intend 'actual fraud' to mean the same thing as a

by the other party.[9]  *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992).  The creditor's reliance need not be objectively reasonable, just subjectively justifiable.  *Field v. Mans*, 516 U.S. 59, 76 (1995).

The first element requires that the debtor have made a false representation or that his words or actions constituted false pretenses.  *In re Koukhtiev*, 576 B.R. 107, 129 (Bankr. S.D. Tex. 2017) ("Plaintiff has failed to satisfy all three elements required to demonstrate that the Judgment resulted from the Debtor's false representation or false pretenses.  Indeed, the record is devoid of sufficient evidence showing that any false representations were made by the Debtor or that his words or actions constituted false pretenses.").  Mid-South did not put on any evidence that the Defendants ever represented anything to Mid-South.  In fact, Mid-South's owner testified that the Defendants did not make any false representations.  Further, Mid-South did not put on any evidence of the Defendants' conduct that constituted false

---

'false representation' . . . . ").  In doing so, the Supreme Court held that a representation was not necessary for the actual fraud prong.  *Id.*  A representation or conduct constituting false pretenses is still required for the false pretenses and representations prong.  *In re Clem*, 2017 WL 7050766 at *35-36 (Bankr. N.D. Tex. 2017) (requiring a statement or conduct by the defendant depended on by the plaintiff for the false pretenses and representations prong but not for the actual fraud prong); *In re Holzhueter*, 575 B.R. 444, 453 (Bankr. W.D. Wis. 2017) (requiring a statement or conduct by the defendant depended on by the plaintiff for the false pretenses and representations prong but not for the actual fraud prong).

[9] In post-trial briefing, Mid-South argued that the Court raised the reliance issue *sua sponte* and implied that they were surprised by the inclusion of reliance as an issue.  Reliance is an element of nondischargeability under § 523(a)(2)(A).  *Allison*, 960 F.2d 481, 483 (5th Cir. 1992).  Therefore, it was raised not *sua sponte*, but by the filing of the complaint.

pretenses. The Defendants did not interact directly with Mid-South in a way that could establish a pretense for them to receive the funds. Thus, the first element is not satisfied, and the debt owed to Mid-South by the Defendants is not excepted from discharge under the false pretenses and representations prong of §523(a)(2)(A).

### 2. Actual Fraud

The Fifth Circuit previously set out the elements for actual fraud nondischargeability, which included the requirement of a representation by the debtor, in *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995). In 2016, the United States Supreme Court concluded otherwise, holding that a representation by the debtor is not required. *Ritz*, 136 S. Ct. at 1586 ("The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyances schemes, that can be effected without a false representation."). In order to establish that a debt is excepted from discharge based on actual fraud, the objecting party must prove: (1) the debtor committed actual fraud; (2) the debtor obtained money, property, services, or credit by the actual fraud; and (3) the debt arises from the actual fraud. *Id.* at 1587-88.

First, the debtor must have committed actual fraud. *Id.* There are two parts to actual fraud: actual and fraud. *Id.* at 1586. For fraud to be "actual," there must be wrongful intent. *Id.* A debtor's subjective intent may be inferred by examining the totality of the circumstances because it most commonly

cannot be established by direct evidence. *In re Van Horne*, 823 F.2d 1285, 1287-88 (8th Cir. 1987) (abrogated on other grounds); *In re Simpson*, 29 B.R. 202, 211-12 (Bankr. N.D. Iowa 1983); *In re Hosking*, 19 B.R. 891, 895 (Bankr. W.D. Wis. 1982); *In re Rickey*, 8 B.R. 860, 863 (Bankr. M.D. Fla 1981). If a plaintiff provides circumstantial evidence of the debtor's intent, the debtor must offer more than an assertion of honest intent to overcome the implications of the circumstantial evidence. *Van Horne,* 823 at 1287-88. If the debtor offers an unsupported assertion of honest intent, the Court must determine whether the debtor's actions "appear so inconsistent with [their] self-serving statement of intent that the proof leads the court to disbelieve the debtor." *In re Cohen*, 185 B.R. at 178 (quoting *Van Horne*, 823 F.2d at 1288).

Reckless indifference to the truth is sufficient to satisfy the actual requirement of actual fraud:

> [A]ctual fraud requires knowledge of the falsity and an intent to deceive. A showing of reckless indifference will be sufficient to satisfy the knowledge element. To establish knowledge based on recklessness, the conduct must exceed negligence and rise to the level of reckless disregard for the truth. A court may find recklessness based on a pattern of conduct or behavior.
> In addition, reckless indifference to the truth is sufficient to prove the requisite intent to deceive. Thus, a reckless disregard of the truth of a statement will fulfill both the knowledge element and the intent to deceive element.

*In re Cohen*, 185 B.R. 171, 177-78 (Bankr. D. N.J. 1994) (internal citations omitted); *see also In re Norris*, 70 F.3d 27, 30 n. 12 (5th Cir. 1995) (finding that

reckless disregard for the truth combined with the sheer magnitude of the resultant misrepresentation may combine to create an inference of intent to deceive under § 523(a)(2)(B)); *see also Farmers & Merchants State Bank v. Perry (In re Perry)*, 448 B.R. 219, 226 (Bankr. N.D. Ohio 2011) ("'[W]illful blindness' does not provide a defense to an action brought under § 523(a)(2)(A), and may instead be used as a factor indicative of fraud."). Therefore, a debtor who recklessly disregards the truth has the requisite wrongful intent for his actions to constitute actual fraud. *Id.*

Fraud, as used in § 523(a)(2)(A), "connotes deception or trickery." *In re Thompson*, 555 B.R. 1, 11 (B.A.P. 10th Cir. 2016) (citing *Ritz*, 136 S.Ct. at 1586). In *Ritz*, the Supreme Court declined to adopt a definition of fraud because of the multiplicity of situations in which it may be present. *Ritz*, 136 S. Ct. at 1586-87. The Seventh Circuit Court of Appeals previously expounded:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise . . . . No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000).

The Supreme Court has recognized that a person who knowingly receives fraudulent funds has committed fraud and the debt is nondischargeable. *Ritz*, 136 S.Ct. at 1589 ("But the recipient of the transfer— who, with the requisite intent, also commits fraud—can obtain assets by his or her participation in the

fraud.  If that recipient later files for bankruptcy, any debts traceable to the
fraudulent conveyance will be nondischargeable.") (internal quotations and
citations omitted).  *Ritz* concerned a fraudulent conveyance where there was
no representation by the debtor.  The Supreme Court held the debt non-
dischargeable.  *Ritz*, 136 S. Ct. at 1585.  There is nothing in *Ritz* that indicates
that this principle applies only to fraudulent conveyances.  One who knowingly
receives embezzled money is practicing the same level of deception as the
recipient of a fraudulent conveyance who knows that he is receiving funds that
he should not.

The second element is that the debtor obtained money, property services,
or credit by the actual fraud.  *Ritz*, 136 S. Ct. at 1587-88.  "The most
straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any
debt' respecting money, property, services, or . . . credit' that the debtor has
fraudulently obtained . . . ." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).
"[T]he phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose
any limitation on the extent to which 'any debt' arising from fraud is excepted
from discharge." *Id.*

The third element requires that the debt arise from the actual fraud.
*Cohen*, 523 U.S. at 218.  "Once it is established that specific money or property
has been obtained by fraud . . . 'any debt' arising therefrom is excepted from

discharge." *Id.* at 218; s*ee also Ritz*, 136 S. Ct. at 1589 ("any debts 'traceable to' the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A).").

The Defendants' debt to Mid-South is nondischargeable under the actual fraud portion of § 523(a)(2)(A). This Court concludes that the Defendants knew of Kimberly's scheme.   Spending money that they knew was embezzled demonstrates their intent to deceive.  By knowingly receiving stolen funds and then spending that money, the Defendants committed actual fraud.   At a minimum, the Defendants recklessly disregarded the truth.   Both Defendants abandoned all accounting and business training that they had in an attempt to shield themselves from the knowledge of Kimberly's scheme.  They knew of Kimberly's past and put her in a position to handle their finances with no supervision.  Instead of investigating the source of the funds in their accounts, they spent the money and refused to look at their bank statements, despite being trained to do so, in order to ensure that they had no "knowledge" of what was going on and would be able to continue spending.  Therefore, even if they had no actual knowledge, the Defendants' willful blindness satisfies the intent element. *In re Cohen*, 185 B.R. 171, 177-78 (Bankr. D. N.J. 1994); *In re Norris*, 70 F.3d 27, 30 n. 12 (5th Cir. 1995); *Farmers & Merchants State Bank v. Perry (In re Perry)*, 448 B.R. 219, 226 (Bankr. N.D. Ohio 2011).

Billy testified that he completely depended on Judy.  He seemed to insinuate that because of his reliance on Judy, he could not be liable for the

funds deposited into JBK's account.  A debtor cannot claim to be "innocent" of fraud simply because he completely turned over the business to his spouse and did not know what the spouse was doing.  *In re Kennedy*, 566 B.R. 690, 724 (Bankr. D. N.J. 2017) ("[L]iability may be found where the spouse claiming innocence was involved in the business or related transactions or participated in the benefits of those transactions.").   The Fifth Circuit has found the "innocent spouse" liable based on partnership and agency principles.  *In re Gauthier*, 349 Fed. Appx. 943, 945-46 ("Where we have imputed fraud from one spouse to another, we have relied on agency theory, and done so only where the spouses were involved in a business or scheme.") (internal quotations omitted); In *re Luce*, 960 F.2d 1277, 1282-83 (5th Cir. 1992) (refusing to discharge debt as to wife where both spouses were involved in a partnership.).  Billy was the president of JBK and enjoyed JBK's benefits.  Both Billy and Judy knew that JBK only made $20,000 to $30,000 a year, but they were spending far beyond that.  Billy cannot claim dependence on Judy to escape liability for being willfully blind to spending embezzled funds.

Likewise, knowingly receiving and spending stolen funds is a deception that fits squarely in the language courts have used to define fraud. *McClellan*, 217 F.3d at 893.  As the Supreme Court found in *Ritz*, knowingly receiving

property that belongs to someone else is fraud for the purposes of §
523(a)(2)(A). *Ritz*, 136 S.Ct. at 1589. The first element is met.

Second, the Defendants obtained $490,980.08 by their actual fraud.
There is no dispute that the Defendants received the money, and the Court has
concluded that they committed actual fraud by knowingly receiving and
spending these stolen funds. The second element is met.

Third, the debt the Defendants owe to Mid-South arises from their actual
fraud. The Defendants were able to spend the Mid-South funds because of
their actual fraud. Further, since it has been established that they obtained
the funds by their actual fraud, this element is met. *Cohen*, 523 U.S. at 214
("Once it is established that specific money or property has been obtained by
fraud . . . 'any debt' arising therefrom is excepted from discharge.").

Because the Defendants committed actual fraud, obtained money by
their actual fraud, and the debt arose from their actual fraud, the Defendants
owe a nondischargeable debt of $490,980.08 to Mid-South under §
523(a)(2)(A).[10]

## B. Dischargeability under 523(a)(4)

Mid-South also asserts that its claim is nondischargeable pursuant to
§523(a)(4), which provides:

---

[10] The Court's holding that the debt is nondischargeable under § 523(a)(2)(A) is sufficient.
Nevertheless, the Court will address the remaining claims while the record remains fresh.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of
this title does not discharge an individual debtor from any debt
. . . .
(4) for fraud or defalcation while acting in a fiduciary capacity,
embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

The phrase "debt for" means "debt arising from" or "debt on account of."

*Cohen*, 523 U.S. at 220-21.   There are three separate types of debts rendered

nondischargeable under §523(a)(4): (1) debts resulting from fraud or

defalcation while acting in a fiduciary capacity; (2) debts resulting from

embezzlement; and (3) debts resulting from larceny.   *In re Humphries*, 516

B.R. 856, 866 (Bankr. N.D. Miss. 2014).   Mid-South did not specify under which

subpart of § 523(a)(4) that it was traveling, so the Court will address all three.

### 1. <u>Fraud or Defalcation While Acting in a Fiduciary Capacity</u>

Determining whether a debtor committed fraud or defalcation while

acting in a fiduciary capacity is a two-step process.   *In re Beveridge*, 416 B.R.

552, 570 (Bankr. N.D. Tex. 2009).   First, it must be shown that the requisite

fiduciary relationship existed prior to the particular transaction from which

the debt arose.   *See, e.g., In re Cross*, 666 F.2d 873, 879 (5th Cir. Unit B 1982);

*In re Menendez*, 107 B.R. 789, 793 (Bankr. S.D. Fla 1989); *In re Valdes*, 98 B.R.

78, 80 (Bankr. M.D. Fla. 1989).   Second, some type of fraud or defalcation must

have occurred during the fiduciary relationship.   *In re Chavez*, 140 B.R. 413,

422 (Bankr. W.D. Tex. 1992).   Because the Court finds that no fiduciary

relationship existed under §523(a)(4) with regard to these Defendants, the Court never reaches the second step.

To determine whether a debtor was acting in a fiduciary capacity under § 523(a)(4), the Court must look to federal law. *Miller*, 156 F.3d at 602. For the purposes of § 523(a)(4), the term "fiduciary" is distinct from the concept of a "fiduciary" under common law. *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998). Rather, it is limited to instances involving express or technical trusts. *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir. 2012). Constructive or *ex maleficio* trusts–those created to combat unjust enrichment–are excluded from the scope of § 523(a)(4). *Tran*, 151 F.3d at 342. "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934).

Mid-South offered no evidence that Billy or Judy were in a fiduciary capacity during the embezzlement of Mid-South funds. There was no evidence of an express or technical trust. The Defendants were in no position of trust at Mid-South nor were they ever entrusted with any property for Mid-South. Judy did work for Mid-South very briefly, but Dennis Jones testified that she

21

was never in a position of trust.  There was no fiduciary duty owed to Mid-South by Billy or Judy.

Mid-South argued that under Mississippi law there was a fiduciary relationship between the parties, citing *Cross Point Church v. Andrews*, 560 B.R. 429 (Miss. 1987) and *Lowery v. Guaranty Bank & Trust Co.*, 592 So. 2d 79 (Miss. 1991).  This argument fails for several reasons.  First, the Fifth Circuit has recognized "the concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law.  Under § 523(a)(4), 'fiduciary' is limited to instances involving express or technical trusts."  *Tran*, 151 F.3d at 342; *see also Miller*, 156 F.3d at 602.  Second, in *Cross Point Church* the debtor "admitted at Trial that as pastor, officer, and Board member, he owed a fiduciary duty. . . ."  501 So. 2d at 445.  The Defendants have not admitted any such duty and did not owe one to Mid-South during the embezzlement.  Third, the Mississippi Supreme Court stated in *Lowery*, "Mississippi law also recognizes informal fiduciary relationships in a legal, moral, domestic, or personal context, where there appears on the one side an overmastering influence or, on the other, weakness, dependency, or trust, justifiably reposed."  592 So. 2d at 83.  Here, the Defendants had no influence over Mid-South.  Mid-South was not depending on or trusting them.  Mid-South trusted Kimberly, and she had influence over Mid-South, but she is not a debtor or defendant here.  The Defendants were not in a fiduciary relationship with Mid-South.

Thus, the debt they owe to Mid-South is not excepted from discharge under the first sub-part of § 523(a)(4).

## 2. Embezzlement

The United States Supreme Court has defined embezzlement as "the fraudulent appropriation of property by a person to whom such property has been intrusted [sic], or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269 (1895).   "There must be proof of the debtor's fraudulent intent in taking the property." *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998).  *Miller* referenced *Brady v. McAllister*, which provided the elements of embezzlement, which are: (1) the creditor entrusted his property to the debtor; (2) the debtor appropriated the property for a use other than that for which it was entrusted; and (3) circumstances indicate fraud. *Id.* (citing *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996)).

Mid-South's embezzlement claim fails because it cannot meet the first element.  According to the testimony of Mid-South's owner, the Defendants were never entrusted with property from Mid-South.  They definitely were not entrusted with the money that they received into their account and that they spent.  Kimberly was entrusted with Mid-South's funds and pleaded guilty to embezzlement, but she is not a defendant in this case.  Because the Defendants did not lawfully receive the funds, their debt owed to Mid-South is not excepted from discharge under the second sub-part of § 523(a)(4).

23

### 3. <u>Larceny</u>

Federal common law defines larceny as a "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Smith v. Williams (In re Smith)*, 253 F.3d 703, 2001 WL 498662 *2 (5th Cir. 2001) (unpublished) (citing *In re Barrett*, 156 B.R. 529, 533 n. 3 (Bankr. N.D. Tex. 1993). Larceny differs from embezzlement in that the original taking of the property in the case of embezzlement was lawful, or with the owner's consent, with larceny, "the felonious intent must have existed at the time of taking." *Moore,* 160 U.S. at 270. To prove larceny, the creditor must prove by a preponderance of the evidence that the debtor feloniously took the creditor's personal property with the intent to convert it or deprive the creditor of it. *In re Barret*, 156 B.R. 529 (Bankr. N.D. Tex. 1993).

The facts here are similar to those of *In re Bowie*, in which a debtor's wife stole funds and had them deposited into the couple's joint bank account. 2010 WL 4340209, at *4 (Bankr. D. Conn. Oct. 25, 2010). In *Bowie*, the plaintiffs did not claim that the debtor ever directly took or helped his wife take any money but that he knowingly received and concealed the stolen funds in their joint account. *Id.* at *2. The debtor claimed to have no knowledge of the deposits or the theft. *Id.* The *Bowie* court found that "[n]otwithstanding the Movant's knowledge or intent, the Plaintiffs' claims against him for receiving stolen property do not fall within the federal common law definition

24

of larceny." *Id.* at *4.  The receipt of stolen property did not constitute larceny

because the debtor did not do the actual taking:

> Unlike the state-law statutory definition, the federal common law definition of larceny is limited to the initial taking of property from its rightful owner and does not include the subsequent receipt, possession, or concealment of such stolen property. [*In re Marcou*, 209 B.R. 287, 293 (Bankr. E.D.N.Y. 1997).]  Historically, it is the very absence of the latter offenses from the scope of common law larceny that led to the creation of a separate statutory offense therefor.  *See* 3 Wayne R. LaFave, *Substantive Criminal Law* § 20.2 (2d ed.) (briefly chronicling the history and evolution of statutes enacted in England and the United States since 1692 to establish receiving stolen property, which is outside the scope of common law larceny, as a separate statutory offense).

*Id.* at *4.  The court found that the debt was dischargeable because the debtor

did not do the original taking.  *Id.*

Mid-South argued that Kimberly's actions and intent should be imputed

to the Defendants because they were involved in her scheme.  The Fifth Circuit

has held a debt nondischargeable under § 523(a)(4) when the debtor actively

participated in a scheme to deprive mortgage holders of foreclosure sale

proceeds.  *In re Cowin*, 864 F.3d 344 (5th Cir. 2017). In *Cowin*, the debtor's

personal conduct and intent in participating in the conspiracy were sufficient

to satisfy the common law definition of larceny.  *Id.* at 350 (debtor prepared

the deeds of trusts, intentionally omitted language in order to divert the funds,

and instructed the trustee to foreclose when he knew that the property was

encumbered).  While this Court has found that the Defendants were at least

willfully blind to Kimberly's scheme, it has not found them to be active participants.

The Defendants wrongfully possessed the funds of Mid-South, but they did not do the original taking. Kimberly took the money from Mid-South. The Defendants' later possession of the money does not amount to larceny. Thus, the debt owed by the Defendants to Mid-South is not excepted from discharge under the larceny sub-part of § 523(a)(4).

Because Mid-South has failed to prove a fiduciary relationship, embezzlement, or larceny, Mid-South has failed to carry its burden in establishing that the Defendants' debt to Mid-South is nondischargeable under § 523(a)(4).

## IV.   CONCLUSION

Mid-South has satisfied, by a preponderance of the evidence, the elements of actual fraud under § 523(a)(2)(A). A separate nondischargeable final judgment will be entered in favor of Mid-South in the amount of $490,980.08.

##END OF ORDER##